IN THE

# United States Court of Appeals
## For the Second Circuit

―――――――

AUGUST TERM, 2024

ARGUED: APRIL 24, 2025
DECIDED: JULY 21, 2025

No. 24-1816

PEDRO HERNANDEZ,

*Petitioner-Appellant,*

*v.*

DONITA MCINTOSH,
SUPERINTENDENT OF THE CLINTON CORRECTIONAL FACILITY,

*Respondent-Appellee.*

―――――――

Appeal from the United States District Court
for the Southern District of New York.

―――――――

Before: CALABRESI, LOHIER, and PÉREZ, *Circuit Judges*.

Petitioner Pedro Hernandez, a New York State ("State") prisoner convicted

of murder and kidnapping, appeals from a judgment of the United States District

24-1816
*Hernandez v. McIntosh*

Court for the Southern District of New York (McMahon, *J.*) dismissing his 28 U.S.C. § 2254 petition for a writ of habeas corpus.  In his petition, Hernandez contends that an instruction given by the state trial court in response to a jury note improperly ignored clearly established Supreme Court precedent and prejudiced the verdict.  The district court adopted the Report and Recommendation of Magistrate Judge Robert W. Lehrburger and denied the writ.  The district court first held that the trial court's jury instruction was so deficient as to deprive Hernandez of due process but then concluded—though not without doubt—that the Antiterrorism and Effective Death Penalty Act ("AEDPA") foreclosed habeas relief based on the state appellate court's conclusion that any instructional error was harmless.  Hernandez challenges this ruling on appeal.  We conclude that the state trial court contradicted clearly established federal law and that this error was not harmless under the deferential standard applied to § 2254 habeas petitions. We therefore REVERSE and REMAND for the conditional granting of the writ.

———————————————

> EDWARD B. DISKANT, McDermott Will & Emery LLP, New York, NY
> (Cindy D. Ham, Jennifer E. Levengood, Jacqueline K. Winters,
> McDermott Will & Emery LLP, New York, NY; Ben A. Schatz, Center
> for Appellate Litigation, New York, NY, *on the brief*), *for Petitioner-
> Appellant.*

2

STEPHEN J. KRESS (Steven C. Wu, *on the brief*), of Counsel, *for* Alvin L. Bragg, Jr., District Attorney for New York County, NY, *for Respondent-Appellee.*

––––––––––––––––––––––––––––

CALABRESI, *Circuit Judge*:

In 2017, a jury sitting in New York State Supreme Court found Hernandez guilty of kidnapping and murdering six-year-old Etan Patz in 1979, nearly forty years prior. Because of the lack of physical evidence, the trial—Hernandez's second, after the first jury hung—hinged entirely on Hernandez's purported confessions to the crime. Central to the trial was whether Hernandez's confessions to law enforcement were made voluntarily, knowingly, and intelligently under *Miranda v. Arizona*, 384 U.S. 426 (1966).

Hernandez, who has a documented history of mental illnesses and a low intelligence quotient ("IQ"), initially confessed after approximately seven hours of unwarned questioning by three police officers. Immediately after Hernandez confessed, the police administered *Miranda* warnings, began a video recording, and had Hernandez repeat his confession on tape. He did so again, several hours later, to an Assistant District Attorney ("ADA"). At trial, the prosecution discussed and played these videos repeatedly.

3

When deliberating during his second trial, the jury sent the judge three different notes about Hernandez's confessions.  The third note asked the trial court to "explain" whether, if the jury found that Hernandez's un-*Mirandized* confession "was not voluntary," it "must disregard" the later confessions, including the videotaped confessions at the local Camden County Prosecutor's Office ("CCPO") and the Manhattan District Attorney's ("DA's") Office.  App'x at 1486.  The trial court instructed the jury, without further explanation, that "the answer is, no."  *Id.* at 1515.  After seven more days of deliberations, the jury acquitted Hernandez of intentional murder but convicted him of felony murder and kidnapping. Hernandez, now sixty-four years old, is currently in state prison, serving a twenty-five years to life sentence for these crimes.

Hernandez appealed to the New York Supreme Court, Appellate Division, arguing among other things that the trial court's jury instruction was inconsistent with the holding of *Missouri v. Seibert*, 542 U.S. 600 (2004), which held unconstitutional the law enforcement interrogation tactic of intentionally obtaining a confession without giving *Miranda* warnings, then administering the warnings, and finally asking the suspect to repeat the confession.  The Appellate Division affirmed, holding that the trial court's instruction was "correct" and,

alternatively, that any error in the instruction was harmless. *People v. Hernandez*, 122 N.Y.S.3d 11, 15 (1st Dep't 2020). Judge Feinman of the New York Court of Appeals denied Hernandez leave to appeal to that court, *People v. Hernandez*, 35 N.Y.3d 1066 (N.Y. 2020), and the U.S. Supreme Court denied certiorari, *Hernandez v. New York*, 141 S. Ct. 1691, 1692 (2021).

Hernandez then petitioned for habeas relief in federal court. The district court denied the petition. It ruled that the Appellate Division acted unreasonably in concluding that there was no constitutional error in the trial court's response to the jury note. But, under the "unforgiving standards applicable on habeas review," it held—though not without doubt—that it could not reverse the Appellate Division's alternative holding that any error was harmless. *Hernandez v. McIntosh*, No. 22-CV-02266 (CM), 2024 WL 2959688, at *6 (S.D.N.Y. June 11, 2024).

We agree with the district court that the state trial court's instruction was clearly wrong under *Seibert*. But, unlike the district court, we conclude—even under the demanding standards of the Antiterrorism and Effective Death Penalty Act ("AEDPA")—that the error was manifestly prejudicial. Accordingly, we reverse and remand for the district court to grant the writ conditionally.

## BACKGROUND

### I.  Patz's Disappearance in May 1979 and the Initial Investigations

On the morning of May 25, 1979, Patz disappeared while walking the two blocks from his family's apartment to his school bus stop in the SoHo neighborhood of New York City.  The mystery of what happened to six-year-old Patz captured the nation's attention.  From missing-person posters to milk cartons, images of the smiling young boy were ubiquitous.

A massive investigation followed Patz's disappearance.  The police performed an "in-depth canvas and search of [nearby] buildings, rooftops, basements and elevator[] shafts[,] backyards and alleys."  App'x at 1712.  The police also searched the bodega next to the bus stop where Patz was last seen, including the basement.  In total, "several police units and the [Federal Bureau of Investigation]" ("FBI") spent "thousands" of hours searching the area in just the first week following Patz's disappearance.  *Id.* at 1619.  In spite of these efforts, no suspects were arrested or charged.  Patz was never found.

In 1979, Hernandez, who was eighteen years old at the time, worked at the bodega next to Patz's school bus stop.  In July 1979, police interviewed Hernandez, along with other employees of the bodega, about Patz's disappearance.  At the time, however, Hernandez was not identified or treated as a suspect.

Approximately three years later, police had focused their attention on Jose Ramos, who had been the boyfriend of Patz's babysitter.  In March 1982, Ramos was arrested after trying to lure two boys into a drainpipe.  Police discovered several photographs of young boys in Ramos's personal property, including one that resembled Patz.  In 1987, Ramos was convicted of indecent assault of a five-year-old boy and sentenced to three-and-a-half to seven years in prison.

The FBI also considered Ramos a suspect in Patz's disappearance.  In June 1988, an Assistant United States Attorney ("AUSA") interviewed Ramos about Patz's disappearance.  Later that year, the AUSA interviewed the son of Patz's babysitter (Ramos's girlfriend), who reported that Ramos had molested him when he was five or six years old.  This happened repeatedly during the "period of time" when his mother (Patz's babysitter) "was walking [] Patz home from school."  Dkt. 1-54 at 8130-8131, *Hernandez v. McIntosh*, No. 22-CV-02266-CM-RWL (S.D.N.Y. filed Mar. 18, 2022).  In 1990, Ramos admitted to molesting another eight-year-old boy on more than one occasion.  He was convicted of "involuntary deviate sexual intercourse" and sentenced to ten to twenty years' imprisonment.

During a subsequent FBI interview in 1991, Ramos admitted that, on the same day Patz disappeared, he met a young boy in Washington Square Park, took

him to his apartment, molested him, and then put him on a subway train. When the agent pressed Ramos for more details about the boy's appearance, Ramos's replies referenced Patz. For example, when asked how tall the boy was, Ramos responded, "well, how tall was Etan Patz?" App'x at 1636. Although Ramos said that the boy "could have been Etan Patz," he insisted that "even if it was Etan Patz, I put him on a subway and sent him to his aunt." *Id.* at 1637. According to the FBI, there were no other reported disappearances or sexual assaults of young boys that day.

The United States Attorney's Office convened a federal grand jury but ultimately declined to prosecute Ramos, concluding that, because there was no indication that Patz had been transported across state lines, there was insufficient evidence to support federal jurisdiction. The Manhattan DA's Office also declined to prosecute Ramos because of the absence of physical evidence.

## II.   The Investigation Is Renewed in 2012

Decades later, the investigation into Patz's disappearance was renewed with a focus on a new suspect, Othniel Miller. Miller was a carpenter with a basement workshop located between Patz's apartment and school bus stop. Miller had done work in the Patz's apartment and was familiar with Patz. The night before Patz disappeared, Miller spent approximately forty-five minutes alone with him in the

8

basement workshop. Miller later told the FBI that he had been "changing out of his work clothes when he gave a dollar to [Patz]" in exchange for helping him with the carpentry. App'x at 1707. He also admitted to having sexual intercourse with a girl who was approximately ten years old in 1979.

In April 2012, the FBI brought a scent dog to Miller's basement. The dog was trained to detect the odor of human decomposition, even after many years. The scent dog indicated by barking that he detected the scent of human decomposition in two areas of Miller's basement. The next day, Miller was brought to the basement and told that the dog had alerted to the scent, to which he replied, "[w]hat if the body was moved?" App'x at 1708. For several days, authorities stopped traffic in lower Manhattan and Miller's former workshop was excavated. Despite the scent dog's positive identification, the dig proved inconclusive and Miller was never charged in connection with Patz's disappearance.

## III.  Law Enforcement Focuses on Hernandez

The excavation drew extensive media attention. After seeing the press coverage, Jose Lopez, Hernandez's brother-in-law, called police with a tip about rumors that Hernandez was involved in the disappearance of Patz. Up until that

point, and now nearly thirty years since Patz's disappearance, Hernandez's life was quiet and arrest-free.

Hernandez has an extensive history of mental illness and low IQ. Long before Patz's disappearance, doctors documented Hernandez's "'obsessive thoughts,' 'hallucinations,' and 'borderline impaired' intelligence[.]" *Hernandez v. McIntosh*, No. 22-CV-02266 (CM) (RWL), 2023 WL 6566817, at *4 (S.D.N.Y. Oct. 10, 2023). Doctors diagnosed Hernandez with a myriad of disorders, including psychotic disorder, schizophrenia/bipolar disorder, chronic mental illness, and memory impairment. "Between 1992 and 2014, various intelligence tests placed Hernandez's IQ between 67 and 76, putting him in the lower one to five percentile range compared to other people his age." *Id.* This meant that Hernandez was "functioning at the lowest level of intelligence compared to other people." Dkt. 1-35 at 853, *Hernandez v. McIntosh*, No. 22-CV-02266-CM-RWL (S.D.N.Y. filed Mar. 18, 2022).

In the decades following his 1979 interview with police, Hernandez told multiple people, including various fellow members at a religious retreat, his neighbor (Mark Pike), and his first wife (Daisy Rivera), that he had killed someone in New York City.

The statements varied widely.  For example, at a church retreat in 1980, Hernandez told a member of his church that he "sodomized" a "kid" in the basement of his workplace and then "stabbed" the child "many times" with a "pointy" "stick."  App'x at 1628.  In the early 1980s, he told his neighbor, Pike, that a "black kid" "threw a ball" at him and he "lost it" and "strangled the kid."  *Id.* at 1627**.**  Also in the early 1980s, Hernandez told his eventual first wife, Rivera, that a "muchacho" (which Rivera took to mean "teenager") "violated" Hernandez and that Hernandez "got very angry" and strangled the boy.  *Id.*  Neither Pike nor Rivera credited Hernandez's statements, and none of the people with whom Hernandez shared his statements reported them to the police.

## IV.    Hernandez Is Questioned and Confesses to Police on May 23, 2012

Based on the tip from Hernandez's brother-in-law, the police executed a self-described "tactical plan" to interrogate Hernandez on May 23, 2012.  At around 7:45 a.m., four or five police cars pulled up outside Hernandez's home in New Jersey, where he lived with his second wife.  New York City Police Department ("NYPD") Detectives Jose Morales and David Ramirez identified themselves to Hernandez as "from the [NYPD] Missing Persons Squad" and "told him[] [that] his name [had] c[o]me up in an old case" and that "[they] wanted to

11

24-1816
*Hernandez v. McIntosh*

speak to him about it."  App'x at 129-130.  Hernandez agreed and accompanied the officers to the CCPO.

Before Hernandez got into one of the police cars, the police patted him down, asked him to "empty his pockets," and placed his possessions in a box in the trunk of the car.  App'x at 306-309.  Hernandez asked if it would be a long time because he needed to take medication at noon, and a detective was sent to his house to pick up his medications.  Hernandez was escorted into the CCPO through a locked back entrance and led to Room 133, which was a windowless eight-by-ten-foot room.  A video camera, disguised as a smoke alarm, was mounted near the ceiling.

The interrogation began at about 8:10 a.m.  While Detectives Morales and Ramirez started questioning Hernandez about his upbringing, Hernandez's first wife, Rivera was purposefully walked past the interrogation room so Hernandez could see her.  After seeing Rivera, Hernandez became upset and asked if the interview was about "child support."  App'x at 151.  The detectives said no and told him that he was there because of a missing child case. Shortly after, the police escorted Hernandez's former neighbor, Pike, past the room.  When Pike walked by the room, however, Hernandez did not recognize him.

After giving him a bathroom break around 10:00 a.m., the detectives placed a well-known missing-person poster of Patz in front of Hernandez and began asking him pointed questions about the case.

At around 10:30 a.m., Manhattan ADA Armand Durastanti arrived at the CCPO and began observing the interrogation via a closed-circuit TV monitor. ADA Durastanti asked an investigator from the CCPO if the interrogation "was . . . being video recorded." App'x at 845. The investigator replied that it was not and asked ADA Durastanti if he wanted the recording devices in the room turned on. ADA Durastanti responded by saying, "why don't we just wait to see what happens." *Id.*

After about four hours of interrogation, around 12:00 p.m., Detective Morales brought in Hernandez's medication. After Hernandez placed a fentanyl patch on his chest and took some pills, he explained to the detectives why he was taking medication. He discussed that he had been diagnosed with and treated in the past for schizophrenia, bipolar disorder, and other mental illnesses.

At around 1:00 p.m., Hernandez said that he had "told [the detective] everything," that he "want[ed] to go home," and that they had him there "against [his] will." App'x at 571-573. The detectives reminded him that he came with

13

them "voluntarily." *Id.* Shortly thereafter, Detectives Morales and Ramirez left

the room and NYPD Detective James Lamendola entered. Detective Lamendola

asked Hernandez questions about his father. According to Detective Lamendola,

Hernandez said that "his father often drank alcohol in excess and was very abusive

to him and his mother and the rest of his family." *Id.* at 494. Detective Lamendola

began talking about the "cyclical patterns of abuse," saying that child abuse "can

cause that child to abuse other children when they were older." *Id.* at 495.

At that time, Hernandez "got extremely emotional." App'x at 495. Now

five hours into the interrogation, Hernandez "began to sob." *Id.* at 496. "[H]e

stood up, he started clenching his stomach and complaining of stomach pains. He

started pacing around the room and then he la[y] on the floor in the fetal position

and started to shake." *Id.* Hernandez told Detective Lamendola that he was "cold"

and "just want[ed] to go home." *Id.* at 564.

After leaving briefly to get Hernandez a jacket, Detective Lamendola

"continued to talk . . . [about] the cycle of abuse." App'x at 497. At that point

Hernandez became angry and "accused [Detective Lamendola] of trying to trick

him." *Id.* at 497-498. As Hernandez cried, Detective Lamendola "continued to tell

24-1816
*Hernandez v. McIntosh*

him that everybody needed to know the truth," *id.* at 502, and that "the truth ha[d]

to come out now," *id.* at 499.

At around 2:00 p.m., Detectives Morales and Ramirez joined Lamendola in

the interrogation room.  They continued asking him if he "had any information"

or "anything to tell [them] about what happened in 1979."  App'x at 184, 503.

Hernandez asked if they were "trying to pin what happened to that kid on [him]."

*Id.* at 184.  He then repeated for the third time that he wanted to go home.  The

detectives told Hernandez they "had a few more questions to ask him, and then

after that, he could leave."  *Id.*

Detectives Morales and Ramirez told Hernandez that they had "spoken to

many people from his past" and revealed Pike, his former neighbor, as the man

who had walked by the room earlier.  App'x at 185-186.  Hernandez then asked to

speak to his wife, to which Detective Ramirez replied that they wanted "to hear

what [he] ha[d] to say[] first."  *Id.* at 186.  At that point, after more than six hours

of interrogation, Hernandez told the detectives, for the first time, that he "did it."

*Id.*  According to Detective Lamendola, Hernandez said that he had seen Patz

standing outside the bodega and asked him if he wanted a soda, that Patz said yes

and accompanied him into the basement of the bodega, that Hernandez "choked

him" and put his body in a "garbage bag," and that he placed the bag in a box and

left it in a trash area around the corner from the bodega. *Id.* at 505. Hernandez

could not explain his motive, but he denied it was sexual.

## V.    After Hernandez Confesses, Police Give *Miranda* Warnings and Question Hernandez Again

Immediately after obtaining Hernandez's confession, the detectives read

Hernandez a six-question *Miranda* warning. At that point, ADA Durastanti,

observing from a different room, requested that the video feed be recorded. The

recording begins at 2:53 p.m. with Detective Ramirez asking Hernandez the final

*Miranda* question: "Now that I have advised you of your rights, are you willing to

answer questions?" Dkt. 1-10 at 14:53, *Hernandez v. McIntosh*, No. 22-CV-02266-

CM-RWL (S.D.N.Y. filed Mar. 18, 2022). After Detective Morales interjected—

"Obviously, yeah, is that right?"—Hernandez responded, "Yes." *Id.*

Detective Lamendola then asked Hernandez to repeat the statement he had

given before being *Mirandized*, instructing him to "start it from the beginning" and

to "tell[] us again exactly what you just told us before about what happened." *Id.*

at 1455-14:56. "When Hernandez did not immediately reply, the detectives began

to prompt him."[1]  *Hernandez*, 2023 WL 6566817, at *8.  Hernandez then provided

an account "almost identical" to what he told the detectives before receiving his

*Miranda* warnings.  *Id.*

The detectives once again presented Hernandez with Patz's missing-person

poster and asked, "is this the guy?"  Dkt. 1-10 at 15:05, *Hernandez v. McIntosh*, No.

22-CV-02266-CM-RWL (S.D.N.Y. filed Mar. 18, 2022).  When Hernandez said that

it was, the detectives handed him a pen and asked him to write a confession on

the poster.  Hernandez asked the detectives how to spell "choke" before writing

---

[1] At one point, Hernandez paused, and the following conversation ensued:

| | |
|---|---|
| Det. Morales: | What time you think it was? |
| Hernandez: | What time? |
| Det. Morales: | It was early in the morning, right? |
| Hernandez: | In the morning.  Sometime in the morning.  He was waiting for the school bus. |
| Det. Lamendola: | Who was waiting for the school bus? |
| Hernandez: | The kid. |
| Det. Lamendola: | What's his name? |
| Hernandez: | Etan Patz? |
| Det. Lamendola: | (Nods) |

Dkt. 1-10 at 14:56, *Hernandez v. McIntosh*, No. 22-CV-02266-CM-RWL (S.D.N.Y. filed Mar. 18, 2022).

24-1816
*Hernandez v. McIntosh*

on the poster, "I am sorry + shoke [sic] him" and signing his name.  *Id.*; App'x at

30.  Questioning ended at around 4:00 p.m.[2]

## VI.    Hernandez Is Interrogated by ADA Durastanti and Confesses Again

The detectives then drove Hernandez from the CCPO to SoHo.  At around

10:00 p.m., they arrived at the corner where the bodega was located in 1979.

Hernandez pointed out where he had first seen Patz and identified two different

street addresses where he might have left the box containing the garbage bag.

At around 11:00 p.m., the detectives drove Hernandez to the Manhattan

DA's Office.  For the next three hours, Hernandez intermittently slept on a couch

and ate in the presence of law enforcement officers.   At around 2:00 a.m.,

Hernandez was taken to an interview room where he was interrogated by ADA

Durastanti, off and on, until a little after 7:00 a.m.[3]  Hernandez once again stated

that he killed Patz, although certain details deviated from his prior confessions at

_____

[2] Shortly before 4:00 p.m., Hernandez spoke with his second wife, Rosemary, and his daughter, Becky Hernandez, in the presence of two detectives.  He told them that "[a] long time ago . . . he killed a child . . . a boy," that he did not know why he did it, and that he would "be in jail for the rest of [his] life."  App'x at 216.

[3] At around 2:18 a.m., ADA Durastanti advised Hernandez of his *Miranda* rights and then told Hernandez: "I know that you spoke to detectives yesterday . . . . I want you to understand that the statement you're making here to me today has nothing at all to do with that statement.  I want you and I to start brand new, okay?"  Dkt. 1-20 at part 1, 2:19, *Hernandez v. McIntosh*, No. 22-CV-02266-CM-RWL (S.D.N.Y. filed Mar. 18, 2022).

18

the CCPO.[4]  Hernandez made several additional statements during the course of ADA Durastanti's interrogation that were inconsistent with one another.

Near the end of the interrogation, ADA Durastanti asked Hernandez about his mental health.  Hernandez explained that his family had a history of mental illness and that he was "bipolar and schizophrenic."  App'x at 1624.  Hernandez then told ADA Durastanti a detailed account of seeing and talking to a "vision" of his dead mother's ghost.  He said, however, that he was unsure if this actually happened or if it was his imagination.

At the very end of the interrogation, at approximately 7:04 a.m., Hernandez asked ADA Durastanti about his right to counsel, leading to the following exchange:

| Hernandez: | Now, can I ask you a question?  Now, I know you read my rights.  Now when you read my rights, you said that if I need an attorney—does that means [sic] when I was talking to you?  That if I didn't want to answer you? |
| --- | --- |
| ADA Durastanti: | Yes. |
| Hernandez: | Oh, that's what it meant? |

---

[4] For example, although Hernandez had told the detectives at the CCPO that he could not remember what Patz was wearing, he told ADA Durastanti that Patz "had a jacket" that was "black or blue."  App'x at 1622.

24-1816
*Hernandez v. McIntosh*

| | |
|---|---|
| ADA Durastanti: | Yes. |
| Hernandez: | Oh. |
| ADA Durastanti: | That if you, you know, if you need, you can have an attorney, if you want an attorney. |
| Hernandez: | I would like to have an attorney to represent me, you know, when, if I were to go to court. |
| ADA Durastanti: | Okay, right, if you were to go to court. |
| Hernandez: | Yeah, I want that. |
| ADA Durastanti: | Right, no, you will have an attorney to represent you . . . if you go to court. |
| Hernandez: | Yeah. |
| ADA Durastanti: | But the question, the question that I was asking was whether you wanted one now. |
| Hernandez: | When I was talking to you? |
| ADA Durastanti: | Yeah. |
| Hernandez: | No, because I don't have nothing to hide no more. |

Dkt. 1-20 at part 4, 7:04-7:05, *Hernandez v. McIntosh*, No. 22-CV-02266-CM-RWL

(S.D.N.Y. filed Mar. 18, 2022). At this point, approximately twenty-four hours had

elapsed since police officers first arrived at Hernandez's home.

## VII.  Hernandez Makes Post-Arrest Statements

Following his arrest, Hernandez was taken to Bellevue Hospital for

psychiatric treatment. While at Bellevue, Hernandez told a nurse that he

"[c]hoked a person 33 years ago," "[t]hat's why [he] [was] in jail," and that he was

20

"sorry." App'x at 461-462. About a month later, in June 2012, Hernandez was transferred to Rikers Island and was evaluated by Dr. Flavia Robotti. Hernandez told Dr. Robotti that he had "hurt a child" and that he had confessed this to his first wife. Suppl. App'x at 1223. Hernandez also told Dr. Robotti that, at the time of Patz's disappearance, "he had command hallucinations[] telling him exactly what to do" and "started hearing other voices talking among themselves." *Id.* at 911-912. Dr. Robotti's assessment was that Hernandez needed "intensive psychiatric treatment," and she referred him to the mental observation ward at Rikers. *Id.* at 956.

In the summer of 2012, Hernandez was evaluated by Dr. Michael First, who diagnosed him with schizotypal personality disorder.[5] Dr. First testified that the disorder was marked by an inability "to differentiate between what is going on in your mind, versus what is occurring in the external world." Suppl. App'x at 1015. During a multi-day evaluation, Hernandez stated several times that he

---

[5] As time passed after his arrest, Hernandez began to express doubts about whether the events he had confessed to had actually occurred. Dr. First testified that changes in Hernandez's confessions, along with his varying degrees of doubt, were the result of a weakening in his "delusional conviction." According to Dr. First, Hernandez's "delusional conviction" was particularly strong after his arrest in May 2012, such that he then completely believed his statements were true. However, within a few months, his confidence in those memories had noticeably diminished.

approached a little boy outside of the bodega and choked him.  He insisted there were other people in the basement with him, including "[o]lder, gray haired people . . . [w]earing night gowns like in a nursing home."  *Id.* at 1121-1122.  Hernandez met again with Dr. First in December 2014, when, within the same day, he stated both that the people in the basement were "not there" and that he had "chok[ed] the kid in [his] mind," yet also that there were "a lot of people in the basement," including "some kids" and "some business people, some dressed up in hospital clothing, elephant colors, clowns, Terry-cloth-type people."  *Id.* at 1287-1288.

In 2014, while detained at Rikers, Hernandez provided similar conflicting statements to Dr. Michael Welner.  Hernandez stated that he had not seen the face of the child he choked but that he nevertheless recognized his photograph on the news.

## VIII.  Hernandez Stands Trial Twice

Hernandez was charged in the New York State Supreme Court with two counts of murder in the second degree and one count of kidnapping in the first degree.  His first trial began in January 2015.  After deliberating for 18 days, the jury announced that it was unable to reach a verdict.  The court declared a mistrial.

24-1816
*Hernandez v. McIntosh*

Hernandez's second trial began in September 2016. Since there was no physical evidence and no contemporaneous witnesses tying Hernandez to Patz's disappearance, the State's case "heavily depended on Hernandez's confessions to law enforcement, as well as the various statements Hernandez made to Pike, Rivera, and others." *Hernandez*, 2023 WL 6566817, at *11. Hernandez presented "substantial evidence" that it was Ramos (Patz's babysitter's boyfriend) who was responsible for Patz's disappearance and that Hernandez "had a well-documented history of mental illness, poor memory, and low intellectual ability." *Id.* In particular, Hernandez suffered from a psychopathology known to cause delusions, hallucinations, and distortions in a person's perception of reality. According to the defense, this disorder made him especially susceptible to confessionary hallucinations. *See id.*

In February 2017, the jury began its deliberations. On the second day, after having sent two prior notes,[6] the jury sent a third note to the trial court, which read as follows:

---

[6] The other two jury notes, prior to the one at issue, asked the following:

We, the jury, request the testimony of [1] judge's instructions on confessions[, 2] Ramon Rodriguez on 10/25/2016 around noon or so

> We, the jury, request that the judge explain to us whether <u>if</u> [] we find that the confession at CCPO before the *Miranda* rights was not voluntary, we must disregard the two later videotape confessions at CCPO and the DA's office[,] the confessions to Rosemary and Becky Hernandez and the confessions to the various doctors.

App'x at 1486 (emphasis noted in original).

The trial court solicited each party's position. The State asserted that the appropriate answer was "no." App'x at 1486. The defense considered that answer to be both "misleading"—because it failed to give the jury guidance on the rules governing un-*Mirandized* confessions—and legally incorrect, because there was "no question" that Hernandez's post-warning confession at the CCPO was improperly obtained as it occurred "within moments" of the involuntary, unwarned confession. *Id.* at 1489-1490. Although defense counsel never cited *Missouri v. Seibert*, 542 U.S. 600 (2004), their argument clearly relied on that precedent. *Id.* at 1505-1508.

---

regarding [Hernandez's] confession[, 3] Neftali Gonzalez, also on 10/25/2016 around 3:45 regarding [Hernandez's] confession.

[ . . . ]

We, the jury, request - would like clarity on[ "]corroboration consequence.["] Clarity on may not convict defendant on his own words solely[?] Inference can only be drawn from proven facts[?]

App'x at 1478.

The defense urged the court to "[a]t the very least . . . instruct [the jury] that it's up to them.  They don't have to disregard them but [can] if they choose to." App'x at 1488.  Ultimately, the trial court read the jury back its question and then said, "[T]he answer is, no."  *Id.* at 1515.

Following the court's response, the jury continued to deliberate for another seven days.  On February 14, 2017, the jury acquitted Hernandez of intentional murder in the second degree and found him guilty of felony murder and kidnapping in the first degree.  The trial court sentenced Hernandez to concurrent terms of twenty-five years to life in prison.

## IX.  Hernandez Appeals

In 2020, the New York Supreme Court Appellate Division, First Department, affirmed Hernandez's conviction.  *People v. Hernandez*, 122 N.Y.S.3d 11, 16 (1st Dep't 2020).  The Appellate Division offered the following on whether the court's jury instruction was erroneous: "Given the precise wording of the note, the court's brief response was correct."  *Id.* at 15.  The court held in the alternative that, even if there were an error, it was harmless because "there [wa]s no reasonable possibility that the verdict would have been different" since Hernandez's confession to ADA Durastanti "was fully attenuated from all of his confessions to the police."  *Id.*  Judge Feinman of the New York Court of Appeals denied leave to

appeal to that court.  *People v. Hernandez*, 35 N.Y.3d 1066 (N.Y. 2020).  Hernandez

then petitioned the Supreme Court of the United States for a writ of certiorari,

which was denied on March 22, 2021.  *Hernandez v. New York*, 141 S. Ct. 1691, 1692

(2021).

## X.    The Instant Action

Hernandez timely filed his petition for a writ of habeas corpus in 2022.  The

petition was referred to Magistrate Judge Robert W. Lehrburger pursuant to

28 U.S.C. § 636(b).   In a comprehensive Report and Recommendation, Judge

Lehrburger found that the trial court's response of "no" to the third jury note was

"so deficient as to deprive Hernandez of due process."   *Hernandez*, 2023 WL

6566817, at *36.  But he was "[c]onstrained" to conclude that, under the AEDPA,

he had to defer to the state court's harmlessness determination and hence, to

recommend that Hernandez's petition be dismissed.  *Id.* at *34.

Judge Colleen McMahon adopted the Report and Recommendation.

*Hernandez v. McIntosh*, No. 22-CV-02266 (CM), 2024 WL 2959688 (S.D.N.Y. June 11,

2024).  Like Judge Lehrburger, Judge McMahon found that the trial court's failure

to give the jurors a proper response to their note was an "error of constitutional

magnitude."  *Id.* at *14.  Judge McMahon further found that "[t]here c[ould] be no

serious question that the erroneous instruction here had a 'special impact' on the

24-1816
*Hernandez v. McIntosh*

jury given the prominence of the confessions to the case." *Id.* "That the jury continued to deliberate for almost a week after the trial court's response," Judge McMahon continued, "strongly suggest[ed] that the jurors continued to struggle mightily—in the absence of meaningful guidance—with how to consider Hernandez's confessions." *Id.* Nevertheless, Judge McMahon held that Hernandez failed to satisfy the "prevailing standard for evaluating harmless error findings on habeas." *Id.* Noting the result was both "strange" and "counterintuitive," Judge McMahon found that the issue was "sufficiently close that it should be reviewed by the Second Circuit" and granted a Certificate of Appealability pursuant to 28 U.S.C. § 2253(c). *Id.* at *6, 14, 15. This appeal timely followed.

## DISCUSSION

Under 28 U.S.C. § 2254, "a person in custody pursuant to the judgment of a State court" may petition a federal district court for a writ of habeas corpus "on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." *Id.* § 2254(a). "We review a district court's grant or denial of habeas corpus *de novo*." *Jordan v. Lamanna*, 33 F.4th 144, 150 (2d Cir. 2022).

AEDPA's revisions of the federal habeas statute, codified at 28 U.S.C. § 2254, govern the disposition of Hernandez's petition. AEDPA prescribes a

highly deferential framework for evaluating issues previously decided in state

court.  As relevant here, under AEDPA,

> a writ of habeas corpus . . . shall not be granted with
> respect to any claim that was adjudicated on the merits
> in State court proceedings unless the adjudication of the
> claim . . . resulted in a decision that was contrary to, or
> involved an unreasonable application of, clearly
> established Federal law, as determined by the Supreme
> Court of the United States.

*Id*. § 2254(d)(1); *Harrington v. Richter*, 562 U.S. 86, 97-98 (2011).

A state-court decision is "contrary to" clearly established law if the court

arrived at a conclusion opposite to the one reached by the Supreme Court on a

question of law, or if the state court confronted facts that are "materially

indistinguishable" from a Supreme Court precedent and arrived at a different

result.  *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000).  The "unreasonable

application" clause of § 2254(d)(1) requires the federal court to consider whether

the state court unreasonably applied Supreme Court precedent to the facts of the

petitioner's case.  *See Holland v. Jackson*, 542 U.S. 649, 652 (2004) (per curiam).

"Under § 2254(d), a habeas court must determine what arguments or theories

supported or . . . could have supported[] the state court's decision; and then it must

ask whether it is possible fairminded jurists could disagree that those arguments

24-1816
*Hernandez v. McIntosh*

or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." *Harrington*, 562 U.S. at 102.

If a petitioner satisfies § 2254(d)'s requirements, we then consider whether the state court's error was harmless. *See Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). In collateral cases, a federal constitutional error is harmless unless it caused "actual prejudice." *Id.* at 637-38 (citation omitted). The Supreme Court recently held that, to demonstrate prejudice, a petitioner must convince the habeas judge that (1) there is "grave doubt" about the petitioner's verdict, as required under *Brecht v. Abrahamson*; and (2) that every fair-minded jurist would harbor at least a reasonable doubt that the error was harmless, as required by AEDPA. *See Brown v. Davenport*, 596 U.S. 118, 122, 135-36, 144 (2022).

Hernandez argues that his petition should be granted because (I) the trial court's response to the jury's note was contrary to, and an unreasonable application of, the Supreme Court's opinion in *Missouri v. Seibert*, 542 U.S. at 621 (Kennedy, J., concurring), and thus was an error cognizable under AEDPA; and (II) this error was not harmless under the two-step inquiry set forth in *Brown v. Davenport*, 596 U.S. at 122.

29

Given the extraordinary facts of this case, we agree that a conditional grant of the writ is merited.

## I.

In evaluating Hernandez's petition, we must first determine whether the trial court's response to the third jury note, and the Appellate Division's subsequent approval of that instruction, were contrary to or unreasonable applications of *Seibert*. And under AEDPA, we must do so while giving deference to the state court that evaluated Hernandez's case.

In considering these questions, both Judge Lehrburger and Judge McMahon found that the trial court's response to the third jury note was not only inconsistent with the holding of *Seibert* but so erroneous as to deny Hernandez due process. After a careful review of the record, and with the benefit of oral argument, we agree.

At the outset, we note that "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). Rather, "[i]n conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Id.* at 68. We may therefore grant relief only

if the state courts' decisions were "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d).

In this case, the jury was entitled to, and indeed instructed to, evaluate the voluntariness of Hernandez's confessions.  As the trial court correctly recognized, the jury was empowered to reach its own conclusions about the voluntariness of the confessions even after the trial court declined to suppress them.  *See* App'x at 1488 ("There was a [suppression] [h]earing and [I] denied suppression.  And if the jury wants to disregard all statements, they can.  That's entirely up to them . . . ."); *People v. Parker*, 205 N.Y.S.3d 194, 197-99 (2d Dep't 2024) (observing that even where the trial court had denied suppression, if "the defendant has placed in issue the voluntariness of his statements to law enforcement officials, the court must submit such issue to the jury under instructions to disregard such evidence upon a finding that the statement was involuntarily made" (internal quotation marks omitted)); *see also Jackson v. Denno*, 378 U.S. 368, 401 (1964) (Black, J., concurring in part) ("Whatever might be a judge's view of the voluntariness of a confession, the jury in passing on a defendant's guilt or innocence is . . . entitled to hear and

determine voluntariness of a confession along with other factual issues on which

its verdict must rest.").

The trial court did instruct the jury, in general terms, about voluntariness.

The court charged the jury that it must disregard any statement of Hernandez's

"unless the [State] ha[s] proved beyond a reasonable doubt that the defendant

made the statement voluntarily." App'x at 1435-1436. But the court did not give

the jury any instruction concerning how to treat subsequent confessions if it found

Hernandez's first confession to be involuntary.

The jury was plainly focused on this question. Indeed, whether

Hernandez's post-*Miranda* confessions were voluntarily or involuntarily obtained

was "*the central issue* in the case." *Hernandez*, 2024 WL 2959688, at *10 (emphasis

in original). The argument that those confessions were involuntarily obtained, as

part of a nearly twenty-four-hour-long period of essentially continuous custodial

interrogations, was at the core of the defense's case.

As we noted earlier, the day after the trial court delivered its charge, the jury

sent three notes focused on the voluntariness of Hernandez's confessions. The

third jury note requested the trial judge to "explain" whether, "if" the jury found

that the pre-*Miranda* confession at the CCPO was involuntary, it "must disregard"

Hernandez's post-*Miranda* confessions.

      As to this question, federal law gives a clear answer.  In *Seibert*, the Supreme

Court held unconstitutional the then-common tactic of intentionally obtaining an

inadmissible, un-*Mirandized* confession, administering a *Miranda* warning after the

suspect had confessed, and finally asking the suspect to repeat the confession post-

warning.  542 U.S. at 620-22 (Kennedy, J., concurring).  This tactic renders a

suspect's post-warning confessions inadmissible "unless curative measures

(designed to ensure that a reasonable person in the defendant's position would

understand the import and effect of the *Miranda* warnings and waiver) were taken

before the defendant's post-warning statement."  *United States v. Moore*, 670 F.3d

222, 230 (2d Cir. 2012).

      The rule laid out in *Seibert* is relevant not only to a court making

admissibility determinations, "but also to jurors who are deciding whether to

consider such statements or to set them aside as involuntary."  *Hernandez*, 2024

WL 2959688, at *10.  The thrust of a *Seibert* claim—that law enforcement used an

improper "two-step interrogation technique" that undercut the voluntariness of a

subsequent confession—is the same whether the claim is raised in the context of a

24-1816
*Hernandez v. McIntosh*

trial court's suppression determination or a jury's assessment of voluntariness. In both instances, *Seibert* instructs that law enforcement's deliberate elicitation of an un-*Mirandized* confession forecloses the jury from considering a subsequent, *Mirandized* confession unless curative measures were taken.[7]

---

[7] Prior to trial, Hernandez moved to suppress his statements to the detectives at the CCPO and his subsequent statement to ADA Durastanti. Among other arguments, he asserted that (1) the pre-*Miranda* statement was inadmissible because he was in custody at the CCPO, and (2) *Seibert* required suppression of the post-*Miranda* statements. The trial court denied Hernandez's motion. The trial court determined that Hernandez "was not in custody at the time his initial statements were made" and, thus, his pre-*Miranda* statements were not subject to suppression. Suppl. App'x at 1502-1503. Because the court found Hernandez's pre-warning statements admissible, it expressly did "not reach the issue of whether the post-*Miranda* statements were sufficiently attenuated" under *Seibert*. *Id.* at 1506. *See United States v. Familetti*, 878 F.3d 53, 62 (2d Cir. 2017) ("Because [the defendant] was not subject to a pre-warning custodial interrogation, we do not reach his corollary argument regarding a deliberate two-step interrogation."). The Appellate Division affirmed. It held that Hernandez's pre-*Miranda* statement was not the product of custodial interrogation "because a reasonable innocent person in [Hernandez]'s position would not have thought he was in custody." *People v. Hernandez*, 122 N.Y.S.3d 11, 13 (1st Dep't 2020).
On habeas review, Judge Lehrburger denied Hernandez's challenges to the state courts' admissibility determinations. He found that, although "several facts len[t] considerable support to Hernandez's argument that he was in custody for purposes of *Miranda*," he was "constrained" to agree that the state court did not "*unreasonably*" apply clearly established Supreme Court law in concluding otherwise. *Hernandez v. McIntosh*, No. 22-CV-02266 (CM) (RWL), 2023 WL 6566817, at *17-18 (S.D.N.Y. Oct. 10, 2023) (emphasis in original).

On this basis, however dubious it may have been, the first, pre-*Miranda* confession was admitted. The trial court, however, left the voluntariness of that first confession up to the jury. *See, e.g.*, App'x at 1435-1436 ("[Y]ou [] may not consider [the statement] as evidence in the case unless the [State] ha[s] proved beyond a reasonable doubt that the defendant made the statement voluntarily."); *id.* at 1437 ("[Y]ou must [] decide whether the defendant was in the custody of the police when he made statements to them."). The jury, in its note to the court, assumed the involuntariness of this pre-*Miranda* confession. *See id.* at 1486 ("We, the jury, request that the judge explain to us whether if . . . we find that the confession at CCPO before the *Miranda* rights was not voluntary, we must disregard [the later confessions]." (emphasis noted in original)). It is the trial court's response to that jury note that we address here.

Under *Seibert*, the correct analysis of Hernandez's confessions thus required determining first whether law enforcement deliberately engaged in a two-step interrogation practice and, second, whether intervening "curative measures" "allow[ed] the accused to distinguish" the several rounds of questioning. 542 U.S. at 622 (Kennedy, J., concurring). Such curative measures can include, for example, "a substantial break in time and circumstances between the prewarning statement and the *Miranda* warning" or "an additional warning that explains the likely inadmissibility of the prewarning custodial statement." *Id.*

Despite the jury's note seeking an "expla[nation]" as to how it was to assess Hernandez's subsequent statements, the trial court provided none. The jury was not told that it could disregard those statements, or on what basis it might even be obligated to disregard them. Instead, the trial court, over the defense's objections, gave the bare response of "no."

*Seibert* clearly instructs that the answer is not "no." Indeed, the answer "no" was manifestly inaccurate, dramatically so with respect to the confession immediately after Hernandez was *Mirandized* at the CCPO, and also with respect to Hernandez's later statement to ADA Durastanti.

We begin with Hernandez's second confession at the CCPO—the first after he was *Mirandized*.  This confession fits precisely the mold addressed in *Seibert*. Detectives interrogated Hernandez for approximately seven hours without administering *Miranda* warnings until Hernandez finally offered a confession. Almost immediately after Hernandez's statement, the detectives administered *Miranda* warnings and law enforcement officials began recording the closed-circuit video feed.  Less than two minutes after Hernandez signed the *Miranda* waiver, the detectives asked him to "tell[] us again exactly what you just told us before." Dkt. 1-10 at 14:55, *Hernandez v. McIntosh*, No. 22-CV-02266-CM-RWL (S.D.N.Y. filed Mar. 18, 2022).

*Seibert* directs that confessions obtained using this two-step interrogation method must not be considered by a jury unless law enforcement used sufficient "curative measures."  542 U.S. at 622 (Kennedy, J., concurring).  But here, although the Appellate Division never addressed the issue, every fair-minded jurist would agree that no curative measures were taken between Hernandez's first, un-*Mirandized* confession and his second confession at the CCPO.  Indeed, the two-step method law enforcement employed with Hernandez was equally stark—if not more so—than the process discussed in *Seibert*.  In *Seibert*, the suspect was

36

arrested and questioned for approximately half an hour without being advised of her *Miranda* rights. *See id.* at 604-05. After the suspect admitted her complicity in the crime, "she was given a 20-minute coffee and cigarette break," after which the interrogator gave *Miranda* warnings. *Id.* at 605. The suspect then repeated what she had said prior to the break and was convicted based on her confessions. *See id.* at 605-06. The Supreme Court concluded that the statement should have been suppressed because it was obtained by a "deliberate, two-step strategy" by law enforcement to get a confession and there were no "additional warning[s]" given or "curative steps" taken between the pre- and post-warning statements. *Id.* at 621-22 (Kennedy, J., concurring).

The only meaningful differences between the two cases are that Hernandez's pre-warning interrogation was significantly longer and the time between his pre- and post-*Miranda* statements was even shorter. Thus, if the jury concluded that the first, un-*Mirandized* confession was involuntary, *Seibert* compelled the jury to disregard the second CCPO confession.[8] The proper answer to the jury's third note was, therefore: as to the second CCPO confession, yes.

---

[8] Indeed, in their briefs to Judge Lehrburger, the parties agreed that if the judge determined that "Hernandez's pre-*Miranda* statements should have been suppressed, then, under *Seibert*, so should his post-*Miranda* statements made at the CCPO." *Hernandez*, 2023 WL 6566817, at *30.

That is sufficient to conclude that the trial court's response to the third jury note was "contrary to . . . clearly established Federal law."  28 U.S.C. § 2254(d)(1).  But that response was also flawed with regard to Hernandez's statements after he left the CCPO.  As mentioned, *Seibert* instructs that the presence of "curative measures" between an involuntary, un-*Mirandized* confession and subsequent *Mirandized* confessions determines whether a jury may consider those later confessions.  Thus, if the jury determined that the first CCPO confession was involuntary—as the third jury note contemplated—then the jury's ability to consider the post-CCPO statements turned on whether law enforcement used sufficient "curative measures."  The trial court's response to the third jury note, however, explained none of this.  By answering "no," the response failed accurately to inform the jury that, if the first CCPO confession was involuntary, the jury might also have been required to disregard his post-CCPO statements.  In other words, with respect to the post-CCPO statements, the answer to the third jury note was not "no," but "maybe."  And the "maybe" depended on whether the jury found the subsequent statements to be sufficiently attenuated from the involuntary statement.

24-1816
*Hernandez v. McIntosh*

In sum, *Seibert* instructs that, in situations where law enforcement engages in a question-first, *Mirandize*-later tactic, a factfinder must question whether the subsequent warning was effective.  Here, the trial court's answer to the third jury instruction deprived Hernandez of the benefit of that rule.  Answering that note with a "no" was "contrary to" and "an unreasonable application of" *Seibert*.[9]

## II.

Our conclusion that the state courts unreasonably applied *Seibert* in responding to the third jury note does not end our inquiry.  We must also determine whether the constitutional error was harmless.

A state appellate court may not affirm a conviction in a trial containing a federal constitutional error unless the State demonstrates that the error was

--------

[9] In order to obtain a writ of habeas corpus in federal court on the ground of error in a state court's jury instruction on matters of *state law*, a petitioner must show not only that the instruction misstated state law but also that the error violated a right guaranteed to him by the federal Constitution.  *Davis v. Strack*, 270 F.3d 111, 123 (2d Cir. 2001); *accord Cupp v. Naughten*, 414 U.S. 141, 146 (1973); *Estelle v. McGuire*, 502 U.S. 62, 72 (1991).  But such an analysis is not required where, as here, the error alleged is a misstatement or misapplication of *federal constitutional law* in a jury instruction.  *Cf. Jackson v. Edwards*, 404 F.3d 612, 628 (2d Cir. 2005) (concluding that the trial court's failure to properly charge the jury under New York law violated the petitioner's due process rights under *Cupp*).  Regardless, here there can be no doubt that the trial court's response to the third jury note "so infected the entire trial that the resulting conviction violate[d] due process."  *Cupp*, 414 U.S. at 147.  Leaving the jury with no direction on how to apply the necessary *Seibert* analysis denied Hernandez the opportunity to present completely, and have the jury fully consider, a "highly credible defense."  *Jackson*, 404 F.3d at 625.

"harmless beyond a reasonable doubt." *Chapman v. California*, 386 U.S. 18, 24 (1967). Here, although the Appellate Division never cited *Chapman* in its review of the trial court's jury instruction, it invoked the correct legal standard, concluding that "there is no reasonable possibility that the verdict would have been different had [additional instructions on attenuation] been given, in light of the strong evidence that [Hernandez]'s confession to [ADA Durastanti] was fully attenuated from all of his confessions to the police." *Hernandez*, 122 N.Y.S.3d at 15 (citations omitted).

"[A] state court's harmless-error determination qualifies as an adjudication on the merits under AEDPA." *Brown*, 596 U.S. at 127. Pursuant to the analysis pronounced by the Supreme Court in *Brown*, a state-court merits determination of harmless error is reviewed under a two-part standard. *See id.* First, relief cannot be granted unless the error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637. Second, federal courts must apply the AEDPA standard prescribed by § 2254(d)(1), that every fair-minded jurist would harbor at least a reasonable doubt that the error was harmless. *Brown*, 596 U.S. at 122, 135; *Chapman*, 386 U.S. at 24. "In sum, where AEDPA asks whether *every* fairminded jurist would agree that an error was

prejudicial, *Brecht* asks only whether a federal habeas court *itself* harbors grave doubt about the petitioner's verdict." *Brown*, 596 U.S. at 136 (emphases in original). Taking each in turn, Hernandez satisfies both standards.

### A.

"When a federal judge in a habeas proceeding is in grave doubt about whether a trial error of federal law had 'substantial and injurious effect or influence in determining the jury's verdict,' that error is not harmless." *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995) (quoting *Brecht*, 507 U.S. at 627); *see also Brown*, 596 U.S. at 135-36 ("[U]nder *Brecht* a petitioner may prevail by persuading a federal court that it alone should harbor 'grave doubt'—not absolute certainty—about whether the trial error affected the verdict's outcome.").

In applying the *Brecht* standard in the related context of evidentiary errors, this Court has considered (1) "the importance of the . . . wrongly admitted [evidence]" to the trial, and (2) "the overall strength of the prosecution's case," with the latter being "probably the single most critical factor in determining whether error was harmless." *Wray v. Johnson*, 202 F.3d 515, 526 (2d Cir. 2000); *see Wood v. Ercole*, 644 F.3d 83, 94 (2d Cir. 2011). The importance of the issue to the trial is determined in part by whether the evidence "bore on an issue that [wa]s

41

plainly critical to the jury's decision" and "was material to the establishment of the critical fact." *Wray*, 202 F.3d at 526 (internal quotation marks and citation omitted).

Here, we must determine (1) whether the erroneous instruction bore on an issue central to the trial such that it was critical to the jury's deliberations; and (2) what, absent the erroneous instruction, was the strength of the prosecution's case. These factors manifestly favor Hernandez.

With respect to the first, the voluntariness of Hernandez's confessions was "plainly a crucial [issue]" at trial. *Id.; see Hernandez*, 2024 WL 2959688, at *12 (finding the prosecution's "case hinged entirely on Hernandez's confessions, and the [State] heavily and repeatedly relied on them to convict Hernandez" (internal quotation marks omitted)). Nothing aside from the confessions directly linked Hernandez to the crime. During summation alone, the State played clips from the taped confessions at least seven times.[10]

_____

[10] As we have already said in a habeas case commenting on the importance of an admitted videotaped confession like this one,

> [w]e do not suggest that the prosecutor improperly emphasized [the petitioner's] statement to the jury. Quite the opposite: since the statement was admitted into evidence, the prosecutor had every right to rely on it in summation, and like a skilled advocate he focused the jury's attention on the strengths of his case. In so doing, however, he revealed his belief about the impact [the petitioner's]

Further, as the jury's multiple notes about the confessions made clear, the voluntariness of Hernandez's statements was also a focus of the jury's deliberations and "critical to the jury's decision." *Wray*, 202 F.3d at 526; *see* App'x at 1478 (first jury note, requesting read-back of judge's instructions on confessions as well as testimony about Hernandez's confessions); *id.* (second jury note, requesting "[c]larity on" whether the jury may "convict defendant on his own words solely"); *id.* at 1486 (third jury note, requesting that the judge "explain" how it should approach the post-warning statements to law enforcement and civilians if it concluded the pre-warning statement was not voluntary).

The second consideration—the strength of the prosecution's case—also weighs strongly in Hernandez's favor. As we have already noted, the prosecution had no support for its case other than Hernandez's own confessions to both law enforcement and non-law enforcement civilians. "As a result, the prosecution's case rested squarely on [the statements'] credibility." *Wood*, 644 F.3d at 94. The jury was entitled to determine independently whether to give the confessions any

statement would have on the jury. That the prosecutor found [the petitioner's] statement so significant confirms our belief that it was, in fact, central to the prosecution's case.

*Wood v. Ercole*, 644 F.3d 83, 98 (2d Cir. 2011).

weight.  A properly instructed jury could have decided that they need not have credited—and indeed, might not be permitted to credit—any or all of the confessions to law enforcement if they determined that the first one was involuntary.  And the statements Hernandez made to non-law enforcement individuals, both before and after his arrest, carried nowhere near the weight of the recorded statements made to the NYPD and ADA Durastanti, especially because they were so manifestly inconsistent.  Those statements did not bear any of the traditional hallmarks of reliability and, indeed, were referenced by the defense as further evidence that Hernandez suffered from serious mental health issues and was prone to confessionary hallucinations.  *See Zappulla v. New York*, 391 F.3d 462, 468-71 (2d Cir. 2004) (determining prosecution's case was weak in part because its witnesses lacked credibility).

The first jury hung, and the second deliberated for nine days, clearly grappling with what weight, if any, to give to the confessions.  The second jury ultimately returned a mixed verdict—acquitting Hernandez of intentional murder but convicting him of felony murder and kidnapping—"suggest[ing] that a conviction was not assured."  *Id.* at 471.

We thus harbor "grave doubt" about whether the trial court's erroneous instruction had a "substantial and injurious effect or influence in determining the jury's verdict." *O'Neal*, 513 U.S. at 436. That is sufficient to satisfy *Brecht.* *See Wood*, 644 F.3d at 96-99 (reversing district court's denial of habeas relief, finding that a videotaped confession elicited from the defendant after he had already invoked his right to counsel was improperly entered into evidence and that such an error was not harmless where the confession was a "significant piece of evidence" that the State relied upon heavily throughout trial); *see also Scrimo v. Lee*, 935 F.3d 103, 115 (2d Cir. 2019) ("The creation of reasonable doubt satisfies the 'substantial and injurious' standard.").

## B.

Because "a state court's harmless-error determination qualifies as an adjudication on the merits under AEDPA," where a state court makes such a determination, AEDPA's strictures also "must be satisfied" in order for a federal court to grant habeas relief. *Brown*, 596 U.S. at 127; *accord Orlando v. Nassau Cnty. Dist. Att'y's Off.*, 915 F.3d 113, 127 (2d Cir. 2019) ("When a state court makes a harmless error determination on direct appeal, we owe the 'harmlessness

24-1816
*Hernandez v. McIntosh*

determination itself' deference under [AEDPA]." (quoting *Davis v. Ayala*, 576 U.S. 257, 269 (2015))); *Zappulla*, 391 F.3d at 466-67.

Thus, for habeas relief to be appropriate in this case, we must conclude not only that the error was prejudicial under *Brecht*, but also that the state court's adverse harmless-error ruling can be overcome under AEDPA—in other words, that it was contrary to, or an unreasonable application of, the applicable standard as determined by the Supreme Court, namely *Chapman v. California*, 386 U.S. at 24. Unlike *Brecht*, where the burden is on the petitioner to show harm, under *Chapman*, it is the State's burden to show beyond a reasonable doubt that the constitutional error was harmless. *See id.* Accordingly, this Court must conclude that "*every* fairminded jurist would agree" that the State failed to meet its burden of showing that the error was harmless beyond a reasonable doubt. *Brown*, 596 U.S. at 136. Or, inversely, we must ask whether *any* "fairminded jurist" applying the *Chapman* standard would find the error harmless beyond a reasonable doubt.

No fair-minded jurist could reach the conclusion that the error was harmless beyond a reasonable doubt. The State manifestly cannot meet its burden of proving that there was "no reasonable possibility" that the verdict would have

been different had the trial court properly addressed the third jury note. *Hernandez*, 122 N.Y.S.3d at 15.

In its analysis, the Appellate Division said nothing about the second CCPO confession. Instead, it concluded that the period between the un-*Mirandized* questioning and ADA Durastanti's questioning—approximately eleven hours, during which time Hernandez was taken around SoHo by police, and intermittently ate and slept in the presence of law enforcement officers—meant that Hernandez's confession to ADA Durastanti was "fully attenuated" from the earlier questioning, rendering that later confession voluntary. *Id*.

The confession to ADA Durastanti presents a closer question than the second CCPO confession. But a properly instructed jury could well have found that the confession to ADA Durastanti, too, was involuntary under *Seibert*. Among other things, Hernandez (1) was in the continual presence of law enforcement for approximately twenty-four hours; (2) has a well-documented history of mental illness, low IQ, and hallucinations; (3) was not provided any explanation by ADA Durastanti, who witnessed his previous interrogation, of the likely inadmissibility of his prior statements; and (4) may not have knowingly waived his *Miranda* rights

24-1816
*Hernandez v. McIntosh*

at the DA's office.[11]  Although there was a substantial temporal gap between the pre-*Miranda* confession at the CCPO and the confession to ADA Durastanti, there is no bright line rule on attenuation, which is a highly fact-specific determination. *Compare United States v. Capers*, 627 F.3d 470, 484 (2d Cir. 2010) (finding a ninety-minute gap insufficient because "the two rounds of questioning bracketed one continual process" and detectives "were with [the subject] throughout the [ninety] minutes, engaging in 'small talk' and advising [the subject] to tell the truth"), *with Moore*, 670 F.3d at 232 (finding a ninety-minute gap sufficient where "the second interview was not treated as a continuation of the first, . . . nor did the investigators use the information obtained from [the earlier] questioning to cross-examine [the subject] or compel him to answer due to the weight of an earlier admission").  Notwithstanding the temporal gap, at the time of Hernandez's confession to ADA Durastanti, he had been in the continual presence of law enforcement for nearly twenty-four hours, was mentally and physically exhausted, and had no opportunity to consult counsel. *Cf. Bobby v. Dixon*, 565 U.S.

---

[11] Indeed, at the end of the interrogation with ADA Durastanti, Hernandez suggested that he did not understand he was entitled to an attorney during the interrogation itself, as opposed to later in court.  *See* Dkt. 1-20 at part 4, 7:04-7:05, *Hernandez v. McIntosh*, No. 22-CV-02266-CM-RWL (S.D.N.Y. filed Mar. 18, 2022).

23, 31-32 (2011) (finding a "significant break in time and dramatic change in circumstances" where the subject of interrogation claimed to have spoken with his lawyer between the unwarned interrogation and his receipt of *Miranda* warnings). Because the jury could have reasonably found that "the unwarned and warned interrogations blended into one continuum," *id.* at 31-32, it could likewise have found that *Seibert*'s "assumption that *Miranda* warnings will tend to mean less . . . after inculpatory statements have already been obtained" applied to Hernandez's confession to ADA Durastanti as well.  *Seibert*, 542 U.S. at 620 (Kennedy, J., concurring).

Furthermore, because the instructional error was undeniably prejudicial to the jury's consideration of the second CCPO confession, the error could not help but influence the jury's assessment of subsequent statements, regardless of how attenuated they were.  For instance, had the jury concluded that the second CCPO confession was involuntary, it would have been precluded from using it to infer the accuracy and consistency of the later confession to ADA Durastanti.  In these circumstances, and given the significant weakness of the State's case absent the confessions, no fair-minded jurist could conclude that the instructional error was harmless beyond a reasonable doubt.

24-1816
*Hernandez v. McIntosh*

The Appellate Division's conclusion that there was evidence of attenuation might be a basis for affirming the trial court's decision to *admit* the subsequent statements. It also might be enough to affirm a verdict by a properly instructed jury. But that determination does not answer whether there is no reasonable doubt that a correctly instructed jury would have reached the same verdict had it known it *could* (or might in fact be required to) account for the involuntary nature of the initial confessions.

As noted throughout, a proper instruction on the principles of *Seibert* with respect to Hernandez's post-*Miranda* confessions would have unquestionably impacted deliberations. *See Hernandez*, 2024 WL 2959688, at *14 ("[T]here can be no serious question that the erroneous instruction here had a 'special impact' on the jury given the prominence of the confessions to the case."). Under the extraordinary circumstances of this case, we believe that no fair-minded jurist would conclude that the State has proved harmlessness *beyond a reasonable doubt*, as it must where, as here, we have identified a constitutional error in the

24-1816
*Hernandez v. McIntosh*

petitioner's state-court trial.[12]  The instant case clearly is one of those rare cases where both *Brown* requirements are met and habeas relief is appropriate.

## CONCLUSION

For the foregoing reasons, we REVERSE the district court's denial of Hernandez's petition and REMAND with instructions to grant the writ conditionally, ordering Hernandez's release unless the State affords him a new trial within a reasonable period as the district court shall set.

---

[12] Pre-*Brown*, this Court has granted habeas relief notwithstanding a state court's harmless-error determination on similar facts.  *See Wray v. Johnson*, 202 F.3d 515, 521, 528-30 (2d Cir. 2000) (reversing district court's denial of habeas relief after finding that the state trial court's error in admitting "improperly suggestive" identification evidence was not harmless where there was no "physical evidence to connect [petitioner] with the crime;" "the only admissible [identification evidence] came from officers who . . . were poorly situated to see [the petitioner's] face;" "the State believed the . . . evidence was important;" and it was "plain that [the evidence] was considered by the jurors" because they requested a re-reading of the evidence during deliberations).  In contrast, this Court has denied habeas relief where there was "significant evidence of [the defendant's] guilt" such that "the erroneously admitted evidence did not result in actual prejudice to [the defendant]."  *Perkins v. Herbert*, 596 F.3d 161, 180 (2d Cir. 2010) (internal quotation marks and citation omitted); *see, e.g., id.* (declining to disturb the Appellate Division's harmlessness finding where "the erroneously admitted evidence was cumulative of the properly admitted evidence").